

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-17-00378-CR

_____

JOSHUA DAVID MCINTOSH, Appellant

V.

THE STATE OF TEXAS

On Appeal from the 396th District Court
Tarrant County, Texas
Trial Court No. 1479308D

Before Gabriel, Kerr, and Pittman, JJ.
Memorandum Opinion by Justice Gabriel

## MEMORANDUM OPINION

A grand jury indicted appellant Joshua David McIntosh with unlawful possession of a firearm by a felon. *See* Tex. Penal Code Ann. § 46.04(a). While that is generally a third-degree felony carrying a maximum prison term of ten years, McIntosh's indictment contained a paragraph alleging that at the time of his offense, he had a prior felony conviction in Illinois for aggravated battery. *See id.* §§ 12.34(a), 46.04(e). Consequently, as an alleged habitual felony offender, McIntosh's potential punishment range increased to a maximum twenty-year prison term. *See id.* §§ 12.33(a), 12.42(a). A jury convicted him of the charged offense, and the trial court assessed his punishment at the maximum twenty-year term of confinement. McIntosh appeals in three issues. We affirm.

## I. BACKGROUND

On December 5, 2016, McIntosh was involved in a single-vehicle accident: the car he had been driving left the roadway and struck a wooden electrical pole. Latonya Lockett, who was driving a school bus for the Fort Worth ISD, came upon the accident scene and stopped because the road was obstructed with debris. McIntosh ran to Lockett's bus screaming for help. When he reached the door, Lockett cracked the door slightly to ask him if she needed to call 911. McIntosh attempted to step on the bus, which prompted Lockett to tell him that he was not allowed to get on the bus but that she would call 911 for him. McIntosh boarded the bus anyway. At the time, there was one student on the bus.

McIntosh was wearing a black hoodie, and Lockett noticed the butt of a gun in the hoodie's pocket. Lockett called 911 to report the accident, but she did not report that McIntosh had a gun because she feared he might use it if he learned that she had seen it. From Lockett's perspective, McIntosh was acting "[v]ery crazy, as if someone was after him," yet Lockett did not see anyone who actually was after McIntosh. When some firefighters arrived, Lockett got their attention by sounding the bus's horn, and she made a motion with her hand in an attempt to alert them that McIntosh had a gun.

James Chastain, a fireman with the Fort Worth Fire Department, approached the bus and started to board when Lockett asked him to get McIntosh off the bus. Chastain asked McIntosh to get off the bus, and McIntosh replied that he wanted the police to come, that he was not getting off the bus, and that nobody else was getting off the bus, either. McIntosh told Chastain that he was being followed and chased, though Chastain did not see anyone chasing McIntosh. Chastain attempted to place himself between McIntosh and Lockett and the student, but McIntosh became agitated and started putting his hands in his hoodie's pocket. Chastain noticed that McIntosh had a gun in the pocket and that McIntosh was pointing the muzzle toward him. So in an effort to calm McIntosh down, Chastain backed up and stood at the door of the bus. With the assistance of other firefighters, Chastain was able to get the student off the bus.

About that time, Fort Worth police officer Matthew McCormick arrived having been dispatched for a call that an erratic male had boarded a school bus and was being hostile. Officer McCormick initially approached the school bus with his Taser drawn and saw that McIntosh had his hands in the pocket of his hoodie. Officer McCormick told McIntosh to show his hands, but McIntosh did not comply. Shortly after this happened, Lockett was able to exit the bus. Officer McCormick then noticed that McIntosh had a handgun in the hoodie's pocket and that McIntosh was pointing the gun at him, which led Officer McCormick to draw his firearm. When backup arrived, Officer McCormick was able to disarm McIntosh, and although McIntosh struggled and tried to resist, the police officers were eventually able to remove him from the bus and arrest him.

After his arrest, the trial court appointed counsel to represent Mcintosh. But before trial, McIntosh requested to represent himself, a request the trial court granted. He was later convicted for the charged offense and sentenced to twenty years' confinement.

## II.  THE TRIAL COURT DID NOT ABUSE ITS DISCRETION BY GRANTING MCINTOSH'S REQUEST TO REPRESENT HIMSELF

In his first issue, McIntosh argues the trial court reversibly erred by granting his request to represent himself or, alternatively, by not appointing standby counsel for him.

## A. APPLICABLE LAW AND STANDARD OF REVIEW

The Constitution guarantees a defendant the right to assistance of counsel in a criminal prosecution. *Gideon v. Wainwright*, 372 U.S. 335, 339–45 (1963); *Lopez v. State*, 343 S.W.3d 137, 142 (Tex. Crim. App. 2011). It also affords a defendant who validly waives his right to assistance of counsel the right to represent himself. *Godinez v. Moran*, 509 U.S. 389, 400, 402 (1993); *Faretta v. California*, 422 U.S. 806, 807 (1975); *Collier v. State*, 959 S.W.2d 621, 625 (Tex. Crim. App. 1997). A waiver of counsel is valid if it was made competently, knowingly and intelligently, and voluntarily. *Godinez*, 509 U.S. at 400, 402; *Faretta*, 422 U.S. at 807; *Collier*, 959 S.W.2d at 625.

The competency that is required to waive the right to counsel is the competence to waive the right, not the competence to represent oneself. *Godinez*, 509 U.S. at 400. The decision to waive counsel and proceed pro se is made "knowingly and intelligently" if it is made with a full understanding of the right to counsel being abandoned, as well as the dangers and disadvantages of self-representation. *Fletcher v. State*, 474 S.W.3d 389, 395–96 (Tex. App.—Houston [14th Dist.] 2015, pet. ref'd) (citing *Faretta*, 422 U.S. at 835–36; *Cudjo v. State*, 345 S.W.3d 177, 184 (Tex. App.—Houston [14th Dist.] 2011, pet. ref'd)). The decision is made "voluntarily" if it is uncoerced. *Id.* at 396 (citing *Godinez*, 509 U.S. at 401 n.12). As we have previously said,

> A trial court need follow no formulaic questioning or particular script in ascertaining the knowing and voluntary nature of a defendant's waiver of counsel. However, if such factors are not otherwise apparent from the

5

record, a trial court's inquiry regarding the defendant's waiver of counsel should center on his background, age, experience, and education. The defendant should be aware that there are technical rules of evidence and procedure, and he will not be granted any special consideration solely because he asserted his pro se rights.

*Cofer v. State*, No. 02-16-00101-CR, 2017 WL 3821885, at *2 (Tex. App.—Fort Worth Aug. 31, 2017, no pet.) (mem. op., not designated for publication) (citations omitted). The trial court's inquiry is not whether the defendant has the skill and experience necessary to represent himself effectively; rather, it is whether the defendant is aware of the disadvantages of self-representation and makes the choice to represent himself with "eyes open." *See Lathem v. State*, 514 S.W.3d 796, 803–04 (Tex. App.—Fort Worth 2017, no pet.).

We review the trial court's decision to allow for self-representation for an abuse of discretion. *See Chadwick v. State*, 309 S.W.3d 558, 561 (Tex. Crim. App. 2010); *McCain v. State*, No. 02-17-00210-CR, 2018 WL 3059964, at *5 (Tex. App.—Fort Worth June 21, 2018, no pet.) (mem. op., not designated for publication).

### B. MCINTOSH'S WAIVER OF COUNSEL WAS KNOWINGLY AND INTELLIGENTLY MADE

The record shows that McIntosh's request to waive counsel was knowingly and intelligently made. Before granting McIntosh's request, the trial court conducted an appropriate *Faretta* inquiry. On October 6, 2017, the trial court conducted a pretrial hearing during which McIntosh invoked his right of self-representation. During that hearing, the trial court explained to McIntosh the charges against him, the habitual

6

felony offender allegation, and the available range of punishment, and McIntosh made it clear he understood the trial court's explanations. The trial court learned that McIntosh was thirty-nine years old, had graduated high school, and had taken a little over a year's worth of college credits, earning a 3.5 grade point average. McIntosh also told the trial court that he had not taken any classes in law.

The trial court made McIntosh aware that there were procedural rules he would need to know: he would need to know the rules of evidence, he would need to know how to present testimony, and he would need to know how to question witnesses. And the trial court explained that if McIntosh were to represent himself, he would be held to the same standard as any lawyer would be, meaning that if he tried to do something that did not comply with the procedural rules, the trial court would not allow it.

The trial court even impressed upon McIntosh the detrimental effect his lack of legal training and knowledge could have on his case if he were to represent himself: the trial court asked McIntosh how many peremptory strikes he would have in picking a jury and what rule of evidence formed the basis of a hearsay objection. McIntosh acknowledged that he did not know. The trial court also told McIntosh that he would not be entitled to standby counsel if he insisted upon representing himself. And the trial court told McIntosh that it strongly advised him not to represent himself. McIntosh stated he understood all of these admonishments. At the October 6 hearing, the trial court declined McIntosh's request to represent himself.

Prior to voir dire on October 16, 2017, McIntosh renewed his request to represent himself. The trial court told McIntosh that it would allow him to represent himself if he so desired but, referencing its prior admonishments at the October 6 hearing, the trial court again warned McIntosh that it would advise him not to do so. The trial court informed McIntosh that regardless of his decision, his trial would go forward as scheduled. It also reiterated that if McIntosh opted to represent himself, he would be treated the same as any other lawyer and would be bound by the rules just like any lawyer would be. The trial court warned McIntosh that it would not appoint him a different attorney and that it would not appoint him standby counsel either. Notwithstanding these admonishments, McIntosh reiterated that he wanted to represent himself.

McIntosh signed an admonishment of self-representation that acknowledged the trial court had advised him of his right to be represented by counsel and his right to be appointed counsel if he could not afford an attorney. McIntosh further represented in the acknowledgment that he understood "[his] right to have counsel appointed for [him] free of charge if [he was] not financially able to employ counsel"; that he "wish[ed] to waive that right"; that he "request[ed] the court to proceed with [his] case without an attorney being appointed for [him]"; and that he was "waiv[ing his] right to counsel." The trial court granted McIntosh's request and released his appointed counsel.

We conclude the above reflects that the trial court adequately informed McIntosh about the dangers and disadvantages of self-representation—including apprising him that there are technical rules of evidence and procedure and that he would not be granted any special consideration solely because he asserted his pro se rights—such that McIntosh knew what he was doing when he waived his right to counsel and made that decision with eyes open. *See Faretta*, 422 U.S. at 835; *Williams v. State*, 252 S.W.3d 353, 356 (Tex. Crim. App. 2008). We therefore conclude McIntosh's decision to waive counsel was made knowingly and intelligently.

### C. MCINTOSH'S WAIVER OF COUNSEL WAS VOLUNTARILY MADE

To the extent McIntosh suggests that his waiver of counsel was not voluntary, we disagree. There is nothing in the record to suggest his decision was coerced. To the contrary, as outlined above, before granting McIntosh's request to represent himself, the trial court went to great lengths to ensure he understood what he was doing, and even after McIntosh stated his preference to represent himself, the trial court asked McIntosh several times whether he really was sure he wanted to do that, affording him several opportunities to change his mind. And not only that, but the trial court also at least twice told McIntosh that it advised him not to waive his right to counsel. Since the record shows McIntosh's decision was not coerced, we conclude it was not involuntarily made. *See Fletcher*, 474 S.W.3d at 396.

9

## D. McIntosh's Waiver of Counsel Was Competently Made

McIntosh contends the record shows his decision to represent himself was not competently made.

McIntosh argues his competency was at issue from the beginning of this case. To support that assertion, he points to his counsel's request that he undergo a competency examination, as well as her statements at his October 6 pretrial hearing that she "ha[d] concerns" about his competency. And he points to statements he made during the October 6 pretrial hearing, suggesting they revealed his incompetency. We conclude, however, that the record reflects that McIntosh's decision to waive counsel and represent himself was competently made.

We begin with McIntosh's focus on his competency examination. The record shows that McIntosh's counsel requested the trial court to examine whether McIntosh was competent to stand trial. The trial court granted that request, and McIntosh underwent a psychological evaluation. Then, at the October 6 hearing, the trial court asked McIntosh's counsel whether he was mentally competent, and she replied that he had undergone a psychological evaluation and that the evaluation showed he was competent to stand trial. Rather than demonstrating that he was incompetent to waive his right to counsel, the fact that McIntosh underwent a competency examination showing he was competent to stand trial instead supports the conclusion that he was competent to waive that right. *See Chadwick*, 309 S.W.3d at 560 (citing *Godinez*, 509 U.S. at 399) (noting that in *Godinez*, the Supreme Court held that the

10

standard for waiving the right to counsel is no higher than for competency to stand trial).

That leads to the comments McIntosh's counsel made during the October 6 hearing. When the trial court asked McIntosh's counsel whether he was mentally competent, McIntosh's counsel replied that his competency examination had showed he was. But she then stated that she had "concerns as to whether psychologically [McIntosh] was competent in terms of his defense." She elaborated, stating that her concern was that McIntosh's decision not to accept a plea deal demonstrated that he did not fully appreciate the strength of the State's case against him. But those particular comments do not go to whether McIntosh was competent to waive his right to counsel. Rather, they speak to McIntosh's technical legal knowledge, or lack thereof, and thus are not relevant to a determination of whether he was competent to waive his right to counsel. *See Fletcher*, 474 S.W.3d at 397 ("[T]he competence required of a defendant seeking to waive his right to assistance of counsel is the competence to waive the right, not the competence to represent himself."); *see also Faretta*, 422 U.S. at 836 (noting that a defendant's "technical legal knowledge, as such, was not relevant to an assessment of his knowing exercise of the right to defend himself").

We do, however, find some comments from McIntosh's counsel relevant to the issue of whether his decision to waive counsel was competently made. She stated that she did not believe McIntosh was mentally incapacitated. She opined that he was a

11

"bright, bright man" who understood the charges against him and was well versed in his case. And she additionally said that McIntosh understood not only her role as his defense counsel but also the roles of the judge, jury, and prosecutor. Those comments support a conclusion that McIntosh was competent to stand trial and, thus, competent to waive his right to counsel. *See Fuller v. State*, 253 S.W.3d 220, 228 (Tex. Crim. App. 2008) (noting a defendant is competent to stand trial if he has a sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding or a rational as well as factual understanding of the proceedings against him).

Finally, we turn to McIntosh's own statements during the October 6 pretrial hearing. During the hearing, McIntosh expressed his belief that his civil rights were violated on the day he was arrested and that he was almost murdered. He stated that he tried to tell his story to the FBI, the ATF, the United States Marshals, the attorney general, the ACLU, and the governor; that he had received no response; and that nobody had come to question him to find out what had happened. McIntosh also asserted that he believed the evidence against him had been tampered with.

McIntosh does not attempt to explain how these statements demonstrate his waiver of counsel was not competently made. In any event, the trial court was in the best position to determine whether McIntosh possessed the requisite competency to waive his right to counsel. *See Fletcher*, 474 S.W.3d at 398. And as explained above,

12

the record contains more than ample evidence to support the trial court's determination that he did.

### E. McIntosh Was Not Entitled to Standby Counsel

Finally, we address McIntosh's alterative argument that the trial court erred by not appointing him standby counsel. A trial court may appoint standby counsel for a defendant who has waived his right to counsel, but the court need not do so, and the court's decision to not appoint standby counsel is not error. *See Burgess v. State*, 816 S.W.2d 424, 428 n.1 (Tex. Crim. App. 1991); *Fulbright v. State*, 41 S.W.3d 228, 235 (Tex. App.—Fort Worth 2001, pet. ref'd).

In sum, because we conclude McIntosh's waiver of counsel was valid and that the trial court was not obliged to appoint him standby counsel, we hold the trial court did not abuse its discretion by granting McIntosh's request to represent himself. We overrule McIntosh's first issue.

## III. MCINTOSH DID NOT PRESERVE ERROR IN THE TRIAL COURT'S DECISION TO PRECLUDE HIM FROM RECALLING HIMSELF AS A WITNESS

In his second issue, McIntosh contends the trial court abused its discretion by not allowing him to recall himself as a witness to introduce additional evidence.

### A. Relevant Facts

During the State's case in chief, the prosecutor introduced a video from Officer McCormick's body cam that showed his interaction with McIntosh, and the prosecutor also elicited testimony from Officer McCormick concerning his interaction

13

with McIntosh. One of McIntosh's defense theories was that he did not really have a gun when he was on the bus and that the body cam video had been tampered with to make it appear that he did. McIntosh's cross-examination of Officer McCormick included questioning on that very subject:

> [McIntosh]: . . . I mean, it doesn't look -- you don't even see my face not one time on that video. Not even on the ground when all that stuff is going on. Not until later down the road.
>
> [Officer McCormick]: One, it's your voice. You can see yourself on the video.
>
> [McIntosh]: How do I know that that video hasn't been tampered with? I can prove that today.
>
> [Officer McCormick]: Okay.
>
> [McIntosh]: I can. I can prove that. That picture is right over here.

After the State rested its case, McIntosh called himself to the stand and told the jury his version of the events that had led to his arrest. After the prosecutor cross-examined McIntosh and the trial court gave McIntosh the opportunity to say anything else he needed to say, the trial court told McIntosh that he could step down from the witness stand. The trial court then asked McIntosh if he had any other evidence to present, and he stated, "I have some visual evidence. I'd like to go over the video." The trial court responded by telling McIntosh that he needed to call a witness to go over that evidence and that he could not just sit at counsel table and talk. When McIntosh asked if he could call himself to the stand, the trial court responded, "You've already called yourself."

McIntosh told the trial court that there were plenty of people he could have subpoenaed to testify at trial but that he was at a disadvantage due to his decision to dismiss his attorney and represent himself. The trial court reminded McIntosh that he had chosen to represent himself despite the fact that the trial court had told him that he would be held to the same standard as lawyers who had completed law school and passed the bar exam. The trial court again asked McIntosh if he had any other witnesses, and McIntosh replied that he did not. Then the following occurred:

THE COURT: Do you rest?

[McIntosh]: I would not like to. I would like to show some actual visual evidence that that's not me on that video with the tattoos.

THE COURT: You may call whoever you wish to show that's not you. Who is your witness?

[McIntosh]: I don't have one, Your Honor.

THE COURT: So do you rest?

[McIntosh]: Yes, I suppose so, Your Honor.

### B. STANDARD OF REVIEW AND APPLICABLE LAW

The reason McIntosh wanted to recall himself to the stand was so that he could provide additional testimony as a sponsoring witness to support the admission of visual evidence that would purportedly show that he was not the person on the body cam video. Thus, his complaint is predicated on the trial court's exclusion of evidence. *See Love v. State*, 861 S.W.2d 899, 903 (Tex. Crim. App. 1993) (noting that defendant's complaint about the trial court's refusal to allow him to recall a

15

prosecution witness for impeachment purposes was predicated upon an exclusion of evidence—the impeachment testimony).

We review a trial court's decision to admit or exclude evidence for an abuse of discretion. *Henley v. State*, 493 S.W.3d 77, 82–83 (Tex. Crim. App. 2016). A trial court abuses its discretion when its decision falls outside the zone of reasonable disagreement. *Id.* at 83. Before an appellate court may reverse the trial court's decision, "it must find the trial court's ruling was so clearly wrong as to lie outside the zone within which reasonable people might disagree." *Id.* (quoting *Taylor v. State*, 268 S.W.3d 571, 579 (Tex. Crim. App. 2008)).

To complain on appeal about the trial court's exclusion of evidence, the complaining party must have properly preserved the complaint. As relevant here, one of the things McIntosh needed to do to preserve his complaint was to comply with rule of evidence 103, which requires a party complaining about the trial court's exclusion of evidence to show the substance of the excluded evidence by offer of proof unless the substance is apparent from the context of the questions asked. Tex. R. Evid. 103(a)(2); *Holmes v. State*, 323 S.W.3d 163, 168 (Tex. Crim. App. 2009). The purpose of the offer of proof is to show what the witness's testimony would have been; otherwise, there is nothing before the appellate court to show reversible error in the trial court's ruling. *Small v. State*, 504 S.W.3d 330, 334 (Tex. App.—Houston [14th Dist.] 2016, no pet.).

16

A party may make an offer of proof in question-and-answer form or in the form of a concise statement by counsel. Tex. R. Evid. 103(b); *Holmes*, 323 S.W.3d at 168. If the latter, counsel must also concisely summarize the evidence offered and—if not apparent—explain its relevance. *Holmes*, 323 S.W.3d at 168. An inadequate offer of proof does not preserve error. *Id.* at 171; *see also Mays v. State*, 285 S.W.3d 884, 890 (Tex. Crim. App. 2009) (holding that error was not preserved when appellant failed to proffer, with some degree of specificity, the substantive evidence he intended to present).

We conclude that McIntosh did not make an adequate offer of proof to preserve error in the trial court's decision to preclude him from retaking the witness stand. McIntosh sought to recall himself to the stand in order to be a sponsoring witness for the introduction of unspecified "visual evidence." But McIntosh did not apprise the trial court of what the substance of his testimony would be on recall with any degree of specificity, let alone "some degree of specificity." *See Mays*, 285 S.W.3d at 890. For instance, he did not present the trial court with any reason to believe his additional testimony would establish the admissibility of the purported visual evidence. He did not provide a basis on which the trial court could have concluded either that he would have been able to properly authenticate the purported visual evidence or that it was self-authenticating, which is a prerequisite for admitting visual materials into evidence. *See* Tex. R. Evid. 901. And he did not provide any

17

information concerning what the visual evidence he sought to introduce was, where it had come from, or why he was qualified to provide opinions regarding its contents.

McIntosh's inadequate offer of proof has left us unable to determine whether the trial court's decision to preclude him from recalling himself to the witness stand was erroneous and harmful. *See Holmes*, 323 S.W.3d at 168 (noting the primary purpose of an offer of proof "is to enable an appellate court to determine whether the exclusion was erroneous and harmful"). Because McIntosh did not make an adequate offer of proof, he failed to preserve his second issue. We accordingly overrule it.

## IV. MCINTOSH WAS NOT ENTITLED TO A NECESSITY INSTRUCTION

In his third issue, McIntosh argues the trial court erred by failing to charge the jury on the defense of necessity.

Necessity is a defensive issue. *See Rogers v. State*, 550 S.W.3d 190, 192 (Tex. Crim. App. 2018). A trial court is not required to sua sponte instruct the jury on a defensive issue that the defendant does not request, and a defendant may forfeit a defensive issue by not preserving it at trial. *See Vega v. State*, 394 S.W.3d 514, 519 (Tex. Crim. App. 2013). A defendant cannot complain on appeal about the trial court's failure to include a defensive instruction that he did not preserve by request or objection. *Id.* McIntosh concedes that he neither requested a necessity instruction nor objected to the trial court's omitting that instruction from the charge. Accordingly, he did not preserve his third issue. *See id.*

18

But even assuming McIntosh preserved his complaint, he still would not prevail. Since necessity is a confession-and-avoidance defense, McIntosh was not entitled to a necessity instruction unless he admitted to the conduct—the act and the culpable mental state—of the charged offense. *See Juarez v. State*, 308 S.W.3d 398, 399 (Tex. Crim. App. 2010); *Spence v. State*, Nos. 02-16-00222-CR, 02-16-00223-CR, 2017 WL 3526346, at *3 (Tex. App.—Fort Worth Aug. 17, 2017, pet. ref'd) (mem. op., not designated for publication). McIntosh stood charged with unlawful possession of a firearm by a felon. *See* Tex. Penal Code Ann. § 46.04(a). As charged in the indictment, the State had to prove (1) that he had been convicted of a felony and (2) that on or about December 5, 2016, he intentionally or knowingly possessed a firearm after that conviction and before the fifth anniversary of his release from confinement or parole for that conviction. *See id.* § 46.04(a)(1); *Jones v. State*, 338 S.W.3d 725, 741–42 (Tex. App.—Houston [1st Dist.] Apr. 14, 2011) (op. on reh'g), *aff'd*, 364 S.W.3d 854 (Tex. Crim. App. 2012).

McIntosh never admitted to knowingly or intentionally possessing a firearm on or about December 5, 2016. In fact, he testified to the contrary. Thus, even if McIntosh preserved his third issue, he nevertheless was not entitled to a necessity instruction because he did not admit to the conduct of the charged offense. *See Juarez*, 308 S.W.3d at 403–04. And since McIntosh was not entitled to a necessity instruction, the trial court did not err by omitting that instruction from the jury charge. *See Ray v. State*, 419 S.W.3d 467, 470 (Tex. App.—Waco 2013, pet. ref'd)

19

(holding that because appellant did not admit to committing the conduct of the charged offense, the trial court did not err by denying his request for a necessity instruction).

Because McIntosh did not preserve his third issue, and because even assuming he did, the trial court did not err by omitting a necessity instruction from the charge, we overrule McIntosh's third issue.

## V. CONCLUSION

Having overruled all of McIntosh's issues, we affirm the trial court's judgment. *See* Tex. R. App. P. 43.2(a).

/s/ Lee Gabriel

Lee Gabriel
Justice

Do Not Publish
Tex. R. App. P. 47.2(b)

Delivered: February 28, 2019